FILED

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

2010 MAY -3  P 1: 37

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| JARED & DONNA MURAYAMA 1997 TRUST, THROUGH ITS TRUSTEE, JARED MURAYAMA<br>5320 Arezzo Drive<br>San Jose, CA 95138<br>Plaintiff,<br><br>V.<br><br>NISC HOLDINGS, LLC.,<br>3050 Chain Bridge Road, Suite 600<br>Fairfax, Virginia 22030<br><br>THOMAS CAMPBELL,<br>1264 Valley Road<br>New Canaan, CT 06840<br><br>DC CAPITAL PARTNERS, LLC AND<br>DC CAPITAL PARTNERS INVESTMENTS, LLC<br>975 F. Street NW, Suite 1050<br>Washington, DC 20004-1454<br><br>INTERNATIONAL BUSINESS MACHINES<br>CORPORATION<br>1 New Orchard Road<br>Armonk, New York 10504-1722<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 1:10CV 447<br>)          CMH / TCB<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Jared Murayama, Trustee of the Jared and Donna Murayama 1997 Trust ("Trust") files

this action for damages against NISC Holdings, LLC ("NISC"), Thomas Campbell, DC Capital

Partners, LLC and DC Capital Partners Investments, LLC (collectively, "DC Capital Partners")

and International Business Machines Corporation ("IBM") as follows:

DC\266675.4

## THE PARTIES

1.      Jared Murayama, Trustee is a resident of the State of California. Mr. Murayama was member of the Board of Managers for NISC and advisor to its Chairman, Thomas Campbell, and the Trust was one of the largest shareholders of NISC.

2.      NISC Holdings, LLC formerly known as National Interest Security Company, LLC ("NISC") is a limited liability company created pursuant to the laws of the State of West Virginia, and maintains its principal place of business at 3050 Chain Bridge Road, Suite 600, Fairfax, Virginia 22030.  As a privately-held company, NISC shares are not traded on any public exchange, and the company is not subject to any public financial disclosure requirements.  NISC was acquired by International Business Machines ("IBM") on March 2, 2010.

3.      DC Capital Partners, LLC and DC Capital Partners Investments, LLC (collectively "DC Capital Partners") are limited liability companies created pursuant to the laws of the Commonwealth of Virginia and maintain their principle place of business at 975 F. Street NW, Suite 1050, Washington, DC  20004-1454.  As a privately-held company, its shares are not traded on any public exchange, and DC Capital Partners is not subject to any public financial disclosure requirements.  DC Capital Partners, as NISC's largest shareholder, controls NISC. Thomas Campbell is the President, managing member and founder of DC Capital Partners.

4.      Thomas Campbell is a resident of Connecticut.  Now, and during the time period relevant to this Complaint, Mr. Campbell served as Chairman of NISC and as President, managing member and founder of DC Capital Partners.  Mr. Campbell controls DC Capital Partners.

5.      IBM is a public company created pursuant to the laws of the State of New York, and maintains its principle place of business at 1 New Orchard Road, Armonk, New York 10504-1722. IBM's shares are listed on the New York Stock Exchange.

## JURISDICTION

6.      Jurisdiction is proper in the Eastern District of Virginia because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs. 28 U.S.C. § 1332(a). Additionally, the parties expressly agreed to the jurisdiction of this Court in the Murayama Financial Claims Settlement Agreement ("MFCSA") under which Plaintiff's causes of action arise.

## VENUE

7.      Venue is proper in the Eastern District of Virginia because NISC resides in the Eastern District and all or a substantial portion of the events or omissions giving rise to the causes of action pled took place in this District. 28 U.S.C. §1391(a).

8.      Additionally, the MFCSA provides for exclusive venue in the state or federal courts of the Commonwealth of Virginia located in the Eastern District of Virginia.

## SUMMARY

9.      Over a mere 30 months, NISC, through its CEO Thomas Campbell and its majority shareholder, DC Capital Partners (also controlled by Mr. Campbell), executed a scheme in which it convinced Mr. Murayama and the Trust to invest heavily in NISC and then later used threats and intimidation to push them out of the company and buy back their shares at a greatly reduced price. In June 2007, Mr. Campbell enticed Mr. Murayama and the Trust to sell their company, Omen, Inc., to NISC and partner with them to grow NISC. Mr. Campbell made promises of reaping a significant return on their investment in the future. After acquiring Omen, Inc., NISC, through Mr. Campbell, began to strip Mr. Murayama and the Trust of benefits they obtained when they sold Omen, Inc. to NISC. In 2008 and early 2009, Mr. Campbell sought and obtained concessions from Mr. Murayama and the Trust to reduce their Class B shares and to subordinate their investments, all for "the good of the company." Mr. Murayama and the Trust

relied on NISC's assurances, through Mr. Campbell, that subordinating his and the Trust's investments would lead to greater rewards in the future. Then, in November 2009, unbeknownst to Mr. Murayama and the Trust, NISC and Mr. Campbell intentionally excluded Mr. Murayama, a member of the Board of Managers of NISC, from board meetings in which the valuation and imminent sale of NISC was discussed along with the other offers received. At the same time, NISC filed a complaint in Fairfax County Court that did not name Mr. Murayama or the Trust, but included numerous allegations of improper conduct by Mr. Murayama. Within hours of filing the legal action, NISC threatened to join Mr. Murayama in the suit and demanded the return of the Trust's shares even **without compensation**. NISC used the threat of protracted litigation, and inclusion of Mr. Murayama, to force Mr. Murayama to resign from NISC's board and force him and the Trust to sell back their Class A shares for $2 million. At all times, Defendants knew they were buying cheap and were about to flip the shares for much, much more. A month later, NISC announced a definitive agreement with IBM to sell NISC. Instead of $2 million, the Trust's Class A shares were worth approximately $9 million, more than four times the amount NISC paid the Trust for their shares.

## FACTS

10. NISC was formed on or about June 22, 2007 as a portfolio company of DC Capital Partners. NISC's primary business is to acquire and consolidate information management and technology companies serving various federal government agencies. This was part of NISC's larger strategy to position NISC for sale to a larger company, such as IBM.

11. The Trust was the majority owner of Omen, Inc. ("Omen"), an information technology and management company headquartered in Annapolis Junction, Maryland. Mr. Murayama was the President, one of the company's founder, and the primary business manager during the twelve years he spent tending to and building Omen's successful portfolio of business.

4

In 2007, the owners of Omen retained an investment banking firm and began the process of selling the business. Due to its successful business operations, Omen was an attractive acquisition target and had numerous suitors, including NISC. Omen received multiple offers for substantial sums of money.

12.     NISC's bid for Omen was not the highest offer. Nevertheless, Mr. Campbell was not dissuaded from pursuing Omen. At the time, Mr. Campbell made numerous and continuing recommendations that Mr. Murayama and the Trust roll over $1 million of their Omen shares in a tax free stock exchange because the future value of the NISC stock would be very high. Mr. Campbell emphasized to Mr. Murayama that his Class A Membership Interest would rapidly appreciate in value. Mr. Campbell promised that Mr. Murayama would have a leadership role in NISC, including a seat on the NISC Board of Managers. Ultimately, because of Mr. Campbell's salesmanship and promises of future returns, Mr. Murayama and the Trust decided to sell the company to NISC.

13.     On or about June 29, 2007, NISC acquired Omen as its first acquisition. In fact, Mr. Murayama voluntarily agreed to allow NISC to defer funding the acquisition until early July 2007, as Mr. Campbell was experiencing difficulties securing the necessary funds. The companies entered into an Amended and Restated Stock Purchase Agreement that set forth the terms of the acquisition. The acquisition included a tax free stock exchange where the Trust purchased 48.78% of the Class A Membership Interests of NISC for $1,000,000, and received Class B non-voting shares of NISC. The Trust acquired its Class A shares at the same price and basis as DC Capital Partners. Also as part of the transaction, NISC held back $1,425,000 of the purchase price to be paid to the Trust eighteen months following the date of closing. As the result of the transaction, the Trust became the second largest equity interest holder in NISC next to DC Capital Partners, and as such, exercised the second largest controlling interest.

5

14.     After acquiring Omen, NISC used the cash made available through the Trust's tax free exchange to acquire additional companies.  As the result of these subsequent transactions, the Trust's Class A Membership Interests in NISC was diluted to 5.418% by December 9, 2009

15.     In July 2007, the Trust appointed Mr. Murayama to the Board of Managers of NISC as expressly authorized by the terms of NISC's purchase of Omen.  As a Board member of NISC, Mr. Murayama was entitled to be noticed for all board meetings and had the right to inspect the books and records upon request.  Despite this fact, and despite the fact that the Trust was among the largest shareholders of NISC, behind DC Capital Partners, Mr. Murayama was prevented from having access to the books, records and activities of NISC and its affiliates.  Mr. Campbell repeatedly ignored and/or refused Mr. Murayama's requests for such information.

16.     In November 2008, NISC, through Mr. Campbell, advised Mr. Murayama that NISC's lenders would not fund payment of the holdback amount of $1,425,000 owed to the Trust.  Mr. Campbell, therefore, requested that Mr. Murayama convert the holdback amount to a loan subordinated behind NISC's commercial lenders and to extend the due date.  Mr. Campbell assured Mr. Murayama that NISC did not have available cash and that the equity owners, including the Trust, would benefit by subordinating and postponing the payment.  Mr. Campbell explained that the extension and subordination of the holdback was necessary to satisfy NISC's lenders, to maintain a healthy cash position and to grow the company.  Despite NISC's clear obligations, Mr. Maruyama relied on Mr. Campbell's promises and assurances and agreed to the concession.

17.     In January 2009, NISC requested that Murayama enter into an Agreement, Release and Acceptance of Reassignment Duties ("Agreement and Release") that, in substantial part, reduced Murayama's responsibilities at NISC and reduced the amount of Class B shares he owned.  Mr. Murayama's responsibilities were reduced to being an on-call advisor to Mr.

Campbell. The Agreement and Release also guaranteed that Mr. Murayama's position on the Board of Managers with NISC and certain affiliates remained unchanged. The Trust's Class B shares were reduced by 60% under the Agreement and Release and Mr. Murayama relied on Mr. Campbell's representations that the company needed to free up shares to compensate and retain employees. He explained that retention of the employees would improve the company and, as Mr. Murayama understood, his Class A share value. Again, based on NISC's assurances, through its Chairman, Mr. Campbell, and because the Trust's Class B ownership interest amounted to a small fraction of its Class A Membership Interest, the Trust agreed.

18.     On January 22, 2009, Mr. Murayama discussed with Mr. Campbell his prospective role at a native Hawaiian organization known as Hawaii 5-0. Hawaii 5-0 is owned by the Menehune Foundation, a charitable, not-for-profit foundation. After receiving express consent from Mr. Campbell, Mr. Murayama devoted some of his time, as an uncompensated advisor, to assist the organization. Mr. Murayama did not, at any time, acquire any ownership interest in Hawaii 5-0, and was not employed by Hawaii 5-0.

19.     Upon information and belief, sometime in November 2009, Mr. Campbell scheduled a meeting of the Board of Managers but did not notify Mr. Murayama of the meeting, which was inconsistent with ordinary business practices and the Limited Liability Company Agreement. Upon information and belief, at this November 2009 meeting, the board members were informed that the sale of NISC was imminent, that NISC had retained the investment banking firm Jefferies & Company to sell the company, and that NISC had received third party purchase offers that would likely result in a dramatic increase in the price of the stock.

20.     At the time of the November 2009 meeting, Mr. Murayama was a Board member and had no apparent conflict that would require his recusal from the discussion regarding the sale of NISC stock.

7

21.    On or about November 9, 2009, NISC initiated a lawsuit against Hawaii 5-0 and several former NISC employees who became employed by Hawaii 5-0 after their tenure with NISC. The Complaint alleged that the defendants, while at Hawaii 5-0, were unfairly competing with NISC for government contracts. The lawsuit was filed in the Circuit Court of Fairfax County and was styled *NISC Holdings LLC et al v. Robert Bregante, et al.*, Civil Action No. 2009-16197.

22.    Neither Murayama nor the Trust were parties to the lawsuit. Nevertheless, in the Complaint, NISC made numerous allegations directly against Mr. Murayama. In the Complaint, NISC accused Mr. Murayama of conspiring with the defendants to unfairly compete with NISC.

23.    Hawaii 5-0, however, did not and does not compete with NISC. Hawaii 5-0 is a Native Hawaiian Organization owned 8(a) corporation which qualifies for set aside work or subcontracting work where the primary government contractor is specifically seeking to benefit from using an 8(a) or small business subcontractor. In fact, by letter dated November 16, 2009, Mr. Murayama's counsel reminded NISC that the two organizations, by law, were precluded from bidding on the same government contracts based on their respective business classifications. Moreover, NISC did not identify any business opportunity pursued by both NISC and Hawaii 5-0.

24.    Within three days of filing the lawsuit, NISC delivered a copy of the Complaint and a detailed Settlement Agreement to Mr. Murayama's counsel, Robert Bodansky. The Settlement Agreement demanded that the Trust return its Class A Membership Interest to NISC even without compensation. NISC threatened to join Mr. Murayama in the suit if Mr. Murayama did not comply with NISC's demand. During the next few weeks, NISC's counsel, Matthew D. Keiser, and Mr. Bodansky discussed settlement terms including the sale of the Trust's Class A Membership Interest. The proposed settlement agreement demanded by NISC, however, was

8

presented to Mr. Murayama as a prepackaged deal which would include him, the Trust, as well as the named defendants. NISC's counsel made clear that to avoid being added to the lawsuit, the Trust was required to give up its shares.

25.    At no time during the settlement discussions did NISC's attorney inform Mr. Murayama's attorney, or did any officer of NISC inform Mr. Murayama, that NISC was actively engaged in negotiations for the sale of the company or that it had received purchase offers that substantially increased the value of the stock.  Nor did NISC disclose that it had retained an investment banking firm to sell the company, or that it had received a professional opinion that valued the Trust's Class A Membership Interest at substantially greater than $2,000,000. Instead, NISC's counsel led Mr. Murayama to believe that a sale was not in the works.

26.    The third party offers, potential sale, and/or the professional opinion on the price of the Class A stock were material information relating to the proposed settlement.  Thus, because information regarding the pending sale was not public at the time of the negotiations and because NISC purposefully kept the information from Mr. Murayama by excluding him from NISC board meetings in which the proposed offers were discussed, Mr. Murayama did not discover, and could not have reasonably discovered through diligent efforts, the third party offers, professional opinion on the price of the Class A stock or imminent sale of NISC.

27.    On December 9, 2009, Mr. Murayama and the Trust executed the Murayama Financial Claims Settlement Agreement, which expressly provided for the sale of the Trust's Class A Membership Interest to NISC for $2,000,000 and obligated Mr. Murayama to resign from NISC's Board of Managers.

28.    During the MFCSA negotiations, NISC knew that the sale of the company was imminent and that the value of the Trust's Class A shares was far greater than $2 million.  NISC,

9

therefore, knew that the purchase of the Trust's shares under the MFCSA resulted in a no risk windfall to NISC's other Class A Members such as DC Capital Partners.

29.     Upon information and belief, NISC and DC Capital Partners also knew that IBM was a ready buyer, and that prior to the public announcement of a definitive agreement, NISC could cheaply retrieve the Trust's Class A shares.  More specifically, in or prior to December 2009, prior to the execution of the MFCSA, IBM made NISC an offer which placed the value of the Trust's Class A Membership Interests well in excess of $2 million.  Then, on January 20, 2010, just forty days after signing the MFCSA, IBM and NISC issued a press release announcing IBM's acquisition of the company.  Pursuant to the terms of the Equity Purchase Agreement, NISC agreed to sell its equity ownership in its operating subsidiaries to IBM for approximately $367,000,000.

30.     DC Capital Partners realized $180 million (nine times its investment of $19.6 million) from the sale to IBM.  Upon information and belief, approximately $4 million of DC Capital Partners' gain resulted directly from NISC's purchase of the Trust's shares.  Based on the ultimate purchase price, the Trust's Class A Membership Interests were actually worth nearly $9 million -- more than 400% more than NISC had represented and paid for them the prior month.

31.     In negotiating the settlement with the Trust, NISC knowingly and intentionally withheld material information, known to other NISC board members, upon which Mr. Murayama could have independently evaluated the fair market value of the Trust's Class A Membership shares.  Mr. Murayama and the Trust relied on NISC's representations and omissions to their detriment.  If the information had been properly disclosed, Mr. Murayama would have concluded that the fair market value of his Class A shares was worth far greater than $2,000,000.  Had Mr. Murayama and the Trust known the true status of negotiations, the offers made to acquire NISC and/or the other information affecting or indicating the true value of the

Class A shares, the Trust would not have executed the MFCSA or sold its shares to NISC at the discounted price.

32.     As a result of NISC's omissions, the Trust accepted less than fair market value for its Class A shares. Based on NISC's sale of its operating subsidiaries to IBM for $367,000,000, the Trust was harmed in the amount of more than $6,000,000.

33.     NISC knowingly withheld information regarding the value of the Trust's Class A Membership Interests when it had a duty to speak and disclose the information to its board member. NISC's omission was with the intention to force the Trust to act, to enter into the MFCSA, and to receive the Trust's Class A shares at substantially less than fair market value. NISC's intention was to enrich its Class A Members, especially DC Capital Partners, at the Trust's expense.

34.     Upon information and belief, IBM, in its acquisition of NISC, assumed the contracts and liabilities of NISC, including the MFCSA and the Trust's claims that are the basis of this lawsuit.

35.     At all times relevant to the foregoing facts, Mr. Campbell was acting in his individual capacity on behalf of DC Capital Partners and NISC.

## COUNT I: FRAUD IN THE INDUCEMENT

36.     Plaintiff incorporates by reference the facts in the preceding paragraphs.

37.     NISC, DC Capital Partners and Mr. Campbell failed to disclose information material to the fair market value of NISC's Class A Membership Interests in November and December 2009 when it sought Mr. Murayama's and the Trust's agreement to sell the Trust's Class A shares under the MFCSA, dated December 9, 2009.

38.     NISC, DC Capital Partners and Mr. Campbell were obligated to disclose such information to Mr. Murayama, a Board member until December 9, 2009. Nevertheless, NISC,

DC Capital Partners and Mr. Campbell knowingly excluded Mr. Murayama from board meetings and discussions that related to the impending sale of NISC without any proper justification.

39.     At the time NISC, DC Capital Partners and Mr. Campbell made their misrepresentations regarding value to the Trust, NISC, DC Capital Partners and Mr. Campbell knew the representations were false, because they had been engaged in significant third-party discussions regarding the impending sale of NISC, DC Capital Partners and Mr. Campbell they had received offers to purchase the company and they had received independent professional valuations of the company. Several of these discussions had resulted in offers to purchase the company at a value far in excess of what NISC, DC Capital Partners and Mr. Campbell represented to the Trust was the value of its Class A Membership Interests.

40.     NISC, DC Capital Partners and Mr. Campbell knowingly misrepresented and omitted material information prior to and during settlement negotiations with Mr. Murayama and the Trust, with the intention of inducing Mr. Murayama to sell the Trust's Class A Membership Interests to NISC at below fair market value, for the total amount of $2,000,000.

41.     Mr. Murayama and the Trust reasonably relied on NISC, DC Capital Partners and Mr. Campbell 's misrepresentations and omissions and, as a result, were fraudulently induced to enter into the MFCSA and sell the Trust's shares at approximately 20% of their actual value. The Trust would not have sold its Class A shares had it known the truth.

42.     The Trust was injured as a result of its reliance on NISC, DC Capital Partners and Mr. Campbell's misrepresentations or omissions in an amount in excess of $6 million.

## COUNT II: ABUSE OF PROCESS

43.     Plaintiff incorporates by reference the facts in the preceding paragraphs.

44.     After filing its November 2009 lawsuit against Hawaii 5-0 and its employees, NISC, DC Capital Partners and Mr. Campbell sought to force non-parties, Mr. Murayama and

the Trust, to enter into the MFCSA as part of a prepackaged deal to settle with the named defendants.

45. NISC, DC Capital Partners and Mr. Campbell were motivated to reclaim the Trust's shares prior to the consummation of the sale of the company because they knew, based on purchase offers, that NISC's shares were and would be worth considerably more in the immediate future.

46. Thus, despite filing no claim against Mr. Murayama or the Trust, NISC, DC Capital Partners and Mr. Campbell used the lawsuit against Hawaii 5-0 to force an agreement with Mr. Murayama and the Trust, wherein NISC would buy back the Class A shares at a discounted price.

47. NISC, DC Capital Partners and Mr. Campbell took an additional step to accomplish their motive when they improperly excluded Mr. Murayama from a November 2009 board meeting, and contemporaneous board discussions, about the valuation and impending sale of the company.

48. After filing the lawsuit against Hawaii 5-0 and its employees, NISC, DC Capital Partners and Mr. Campbell knowingly misused the settlement process to remove Mr. Murayama and the Trust (non-parties to the lawsuit) from NISC and purchase the Trust's shares for a paltry $2 million—about 20% of what those shares were worth a mere month later upon the sale of NISC's operating subsidiaries to IBM.

49. NISC, DC Capital Partners and Mr. Campbell's misuse of process, following the filing of its lawsuit against Hawaii 5-0 *et al*, caused Mr. Murayama and the Trust to enter into the MFCSA, and thereby losing more than $6,000,000, an amount the Trust was legally entitled to prior to NISC's abuse of process.

13

## COUNT III: UNJUST ENRICHMENT

50.     Plaintiff incorporates by reference the facts in the preceding paragraphs.

51.     The Trust, in selling its Class A Membership Interests to NISC, conferred a benefit on NISC, DC Capital Partners and Mr. Campbell for which NISC, DC Capital Partners and Mr. Campbell should have reasonably expected to pay fair price.  At the time NISC accepted the Class A Membership Interests, NISC, DC Capital Partners and Mr. Campbell had reason to believe, based on information known only to NISC, DC Capital Partners and Mr. Campbell, that the market value of those shares were much greater than $2 million.  As a result, NISC, DC Capital Partners and Mr. Campbell have been unjustly enriched in the amount of at least $6,000,000.

## DEMAND FOR PUNITIVE DAMAGES

52.     Plaintiff incorporates by reference the facts in the preceding paragraphs.

53.     NISC, DC Capital Partners and Mr. Campbell's fraudulent conduct was done intentionally and with malice or wanton and willful disregard to the rights of the Trust.

## DEMAND FOR JURY TRIAL

54.     Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a jury trial on all issues arising in this Complaint.

## PRAYER FOR RELIEF

Wherefore Plaintiff, The Jared & Donna Murayama 1997 Trust demands judgment in its favor and against NISC Holdings LLC, Thomas Campbell, DC Capital Partners, LLC, DC Capital Partners Investments, LLC and IBM Corporation, jointly as follows:

1. Actual damages in an amount in excess of $6 million, plus attorneys fees and costs of bringing suit.

2. In the alternative, an order rescinding the Murayama Financial Claims Settlement Agreement.

3. Punitive and/or Exemplary Damages.

4. Pre-judgment and post-judgment interests.

5. Treble damages, pursuant to Va. Code Ann. § 18.2-500 (West 2008).

6. Reimbursement of attorneys fees and costs.

7. For all other relief to which it may show itself entitled.

Dated: May 3, 2010

Respectfully submitted,

Shelby J. Kelley
Virginia Bar No. 44229
Brett Heather Freedson
Virginia Bar No. 45381
LaShon K. Kell (*to be admitted pro hac vice*)
Attorneys for Jared & Donna Murayama 1997 Trust
Bracewell & Giuliani LLP
2000 K Street, N.W., Suite 500
Washington, DC 20006
(202) 828-5800 (telephone)
(202) 223-1225 (facsimile)
shelby.kelley@bgllp.com
brett.freedson@bgllp.com

E.F. Mano DeAyala (*to be admitted pro hac vice*)
Buck Keenan LLP
Attorneys for Jared & Donna Murayama 1997 Trust
700 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 225-4500 (telephone)
(713) 225-3719 (facsimile)
DeAyala@buckkeenan.com